**In re the GUARDIANSHIP OF B.H., and S.H., Minor Children.**

No. 67A05–905–JV–231.

Court of Appeals of Indiana.

June 15, 2000.

Rehearing Denied Aug. 17, 2000.

**744**

Daniel F. Zielinski, Deckard & O'Brien, Danville, Indiana, for Appellant.

Sharon L. Hammond, Greencastle, Indiana, for Appellee.

## OPINION

ROBB, Judge.

Edward Holley appeals from the trial court's denial of his motion to terminate temporary guardianship and motion to dismiss petition for appointment of permanent guardian over his two minor children, B .H. and S.H. We reverse and remand.

### Issues

Holley raises a single issue for our review: whether the trial court abused its discretion in denying his motions and granting permanent guardianship over the children to the children's step-father, John Childress, after their mother died.

### Facts and Procedural History

Holley and Sherrie (Holley) Childress are the natural parents of B.H. and S.H. Holley served in the United States Army from 1974 until his retirement from the Army in 1996, and the family was stationed in various places throughout the marriage. After Holley and Sherrie separated and prior to their divorce, Holley was stationed in Germany and later in Boston. Holley and Sherrie were divorced by decree of dissolution entered November 27, 1996. The decree provided for Sherrie to have primary physical custody of the children, granted Holley visitation, and ordered him to pay child support in the amount of $120 per week. An order subsequently entered to clarify visitation issues provided that Holley must give Sherrie forty-eight hours notice of his intent to exercise his visitation, and must give five days' notice if he intended to remove the children from the state.

Upon Holley's retirement, he found a job and settled in Houston, Texas. Sherrie married Childress in August 1997, and the children resided with them until Sherrie's death on December 21, 1998. On December 22, 1998, Childress filed an emergency petition for temporary appointment of a guardian over B.H. and S.H., seeking to have himself named their

guardian. The petition was granted that same day without a hearing. A week later, Childress filed an affidavit in support of his original petition, which averred that

> [t]he emergency nature of the filing of my Petition was also done out of my fear and contemplation that Mr. Holley will further traumatize [B.H.] and [S.H.] by coming to the funeral or coming to our home shortly thereafter and attempting to take the Children out of State without the benefit of a Guardianship proceeding wherein [B.H.] and [S.H.] can have an opportunity to voice their concerns and desires to the Court in chambers and this Court can hear and receive evidence for purposes of determining all matters relating to [B.H.] and [S.H.]'s best interest.

R. 10.

On January 11, 1999, Holley filed a petition to terminate the temporary guardianship and also a motion for visitation. On January 14, 1999, Childress filed a petition to appoint himself permanent guardian over the children, and a hearing on all pending motions was held that same day. The trial court took Holley's petition to terminate the temporary guardianship under advisement, granted his motion for visitation and set a hearing for a later date on Childress' petition for permanent guardianship, pending decision on Holley's petition to terminate. After the hearing, Holley filed a motion to dismiss the petition for permanent guardianship.

On the date set for hearing on the petition for permanent guardianship, the parties appeared, and the trial court denied Holley's petition to terminate and motion to dismiss. Evidence was then heard on the petition for permanent guardianship. Pursuant to a request for special findings of fact and conclusions of law, the trial court entered an order finding that Holley was unfit to care for his children and that he had abandoned them, and granted Childress' petition for permanent guardianship. Holley now appeals.

## Discussion and Decision

Holley contends that the trial court erred in denying his motions to terminate the guardianship proceedings and instead granting permanent guardianship over his children to Childress.

### I. Standard of Review

■ At Holley's request, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). All findings and orders of the trial court in guardianship proceedings are within the trial court's discretion. Ind. Code § 29-3-2-4; *E.N. ex rel. Nesbitt v. Rising Sun–Ohio County Community Sch. Corp.*, 720 N.E.2d 447, 450 (Ind.Ct.App. 1999). Thus, we review those findings under an abuse of discretion standard. *Id.* In determining whether the trial court abused its discretion, we look to the trial court's findings of fact required by Indiana Trial Rule 52. *See Northern Indiana Pub. Serv. v. Dozier,* 674 N.E.2d 977, 989 (Ind. Ct.App.1996). First, we determine whether the evidence supports the findings. *Culley v. McFadden Lake Corp.,* 674 N.E.2d 208, 211 (Ind.Ct.App.1996). Second, we determine whether the findings support the judgment. *Id.*

■ The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* Findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. *Id.* The judgment is clearly erroneous if it is unsupported by the findings of fact and conclusions which rely on those findings. *Id.* In determining whether the findings or judgment are clearly erroneous, we consider only the evidence most favorable to the judgment and all reasonable inferences flowing therefrom. *Gunderson v. Rondinelli,* 677 N.E.2d 601, 603 (Ind.Ct.App.1997). We will not reweigh the evidence or judge the credibility of the witnesses. *Id.* Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain

them.  *Yates–Cobb v. Hays,* 681 N.E.2d 729, 733 (Ind.Ct.App.1997).

## II.  Surviving Parent v. Guardian

∎   Child custody determinations fall within the discretion of the trial court and we will not disturb such determination on appeal absent an abuse of that discretion. *In re Guardianship of Riley,* 597 N.E.2d 995, 997 (Ind.Ct.App.1992).  We are reluctant to reverse a custody determination unless it is clearly erroneous and contrary to the logic and effect of the facts and circumstances.  *Id.*  Although Indiana courts can award custody of children to someone other than the parents, such awards are generally made only following a determination that the parents are unfit or have all but abandoned the child to the care of a third person.  *Id.*

Indiana Code section 29–3–3–3 states as follows:

> Except as otherwise determined in a dissolution of marriage proceeding[,] a custody proceeding, or in some other proceeding authorized by law, including a proceeding under section [29–3–3–6] or another proceeding under this article, and unless a minor is married, the parents of the minor jointly (or the survivor if one (1) parent is deceased), if not an incapacitated person, have, without the appointment of a guardian ... the right to custody of the person of the minor
> . . . .

Section 29–3–3–6, which is referred to in the proceeding section, states:

> (a) The surviving parent of a minor does not have the right to custody of the minor without a proceeding authorized by law if the parent was not granted custody of the minor in a dissolution of marriage decree *and* the conditions specified in this section exist.
> (b) If:
>   (1) the surviving parent, at the time of the custodial parent's death, had required supervision during visiting privileges granted under a dissolu-

tion of marriage decree involving the minor;  or
>   (2) the surviving parent's visiting privileges with the minor had been suspended at the time of the death of the custodial parent;

> the court on petition by any person ... or on the court's own motion, may appoint a temporary guardian for the minor for a specified period not to exceed sixty (60) days.

Ind.Code  § 29–3–3–6(a),  (b)  (emphasis added).

∎   These provisions implicitly acknowledge the principle that a parent has a presumptive right to custody of his or her minor children absent evidence of unfitness or abandonment.  In the case of *In re Custody of McGuire,* 487 N.E.2d 457, 460 (Ind.Ct.App.1985), this principle was described as follows:

> [I]n a custody dispute between a parent and a third party ..., the focus is significantly different because the parties are not on par.  Although the child's best interest is still of great importance, it is presumed that it is in the best interest of the child to be placed in the custody of the parent.  Consequently, a nonparent who seeks to displace the parent as custodian bears the burden of overcoming the parent's presumptively superior right to custody.  This burden has been described to require a showing, by clear and cogent evidence, that the parent is unfit or has acquiesced in or voluntarily relinquished custody to the third party for such a long period of time that "the affections of the child and the third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child."

*Id.* at 460 (quoting *Hendrickson v. Binkley,* 161 Ind.App. 388, 316 N.E.2d 376, 379 (1974), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975)).  However, this court has since recognized that the preeminent concern is the best interests of the child, and that there might be reasons for

preferring a nonparent over a parent which may not fit neatly into one of the three aforementioned categories. *In re Paternity of L.K.T.*, 665 N.E.2d 910, 912 (Ind.Ct.App.1996). Therefore, when considering the placement of custody of a child with a nonparent, as opposed to a parent, our review of the record is not limited only to determining the existence of unfitness, long acquiescence, or voluntary relinquishment of custody by a parent. Instead, we will presume that the trial court correctly applied the law and will consider

> whether there is any evidence in favor of the trial court's determination that the presumption the interest of the child would be best served by placing him in the custody of the natural [parent] had been sufficiently rebutted by the evidence.

*Turpen v. Turpen*, 537 N.E.2d 537, 539 (Ind.Ct.App.1989).

We note initially that Indiana Code section 29–3–3–6 does *not* require a hearing in order for Holley to have the right to custody of his children. Childress has alleged in his brief that the March 1997 order requiring Holley to give notice of his intent to exercise visitation constituted a "restriction" on Holley's visitation. Brief of the Appellee at 11, 14–15. The requirement of notice and a number or address at which the children can be reached during visitation is a standard requirement in most counties' visitation guidelines and is a reasonable requirement to impose in any event. It is not, as Childress characterizes it, a restriction on visitation, and it certainly does not constitute supervision or suspension of visitation as those terms are used in section 29–3–3–6.

■ Here, it is presumed that it is in the best interest of B.H. and S.H. to be placed in the custody of Holley, as their surviving natural parent. It was Childress' burden to rebut that presumption by showing that Holley was unfit as a parent, that he had long acquiesced in the current custody arrangement, or had vol-

untarily relinquished custody of B.H. and S.H. to Childress or other such circumstances that demonstrate the best interests of the children would be best served in his care.

We acknowledge the trial court's findings of fact addressing each of the above factors as enumerated by the dissent. Childress presented evidence that, prior to Holley and Sherrie's separation in 1991, Holley had been known to be abusive to Sherrie and verbally abusive to B.H. and also to have abused alcohol. However, it was Childress' burden to prove Holley's unfitness *at the present time*. *Hendrickson v. Binkley*, 316 N.E.2d at 380. The incidents to which Childress alludes occurred at least ten years prior to these proceedings and without specific evidence that anger control or alcohol remained problems for Holley, are not relevant. Indeed, Holley testified that he had attended Alcoholics Anonymous meetings while stationed in Germany, and although he no longer attends meetings, he currently drinks minimally. Further, Holley testified that upon being confronted about his behavior, he recognized its inappropriateness and testified that it did not occur again.

Following the parties' separation, Holley agreed that Sherrie should have primary physical custody of the children, and due to his assignments for the Army, was unable to visit with the children on a regular basis. Since retiring from the Army, he has resided in Houston, Texas. Childress alleges that this shows long acquiescence or abandonment of the children. However, Holley has had visitation with the children as time and circumstances permitted, and has attempted contact by phone and by e-mail. He has also paid child support.

We do not believe that the trial court's conclusions that Holley was unfit, that he had abandoned his children, and that it is not in the best interest of B.H. or S.H. to be placed in Holley's custody are supported by evidence sufficient to rebut the

presumption of his right to custody. Moreover, we have some reservations about relying too heavily upon those findings which reflect poorly on Holley's character and past activities because it does not appear, from our review of the transcript, that Holley was given a full opportunity to present his case. For instance, at the conclusion of Childress' presentation of evidence, the trial judge stated: "Despite the fact that I don't want to do this, I'm going to come back at one and listen to Mr. Holley, because we are here, I guess. And because I'm going to have to ruin my afternoon. Ruin in the sense that I had other plans, but Mr. Holley's testimony I want to hear . . . ." R. 360. This was not the first nor the last allusion the trial judge made to her desire to expedite the process and move the hearing along as quickly as possible, although it is the most egregious. *See also* R. 287, 289–90, 438. Further, although we cannot independently substantiate this claim because the court reporter's tape ended and cut the trial judge off mid-sentence at the conclusion of the hearing, Holley claims that after he testified, the trial judge "suspended the hearing and [Holley] was not permitted to call his witnesses." Brief of the Appellant at 4. This apparent rush to judgment is reflected in many of the trial court's findings of fact.[1]

We do not discount the apparently close and loving relationship between Childress and the children, and we admire Childress' willingness to accept responsibility where none is required, especially in this era when so many fail or refuse to accept responsibility that is rightly theirs. We also acknowledge the difficult and painful circumstances which led to this proceeding, and we are cognizant of the upheaval that a change in custody will undoubtedly require. However, the mere fact that

Childress and the children love each other and that the children wish to remain with him is not sufficient to overcome Holley's presumptively superior rights to custody of his children. The evidence at the hearing was not sufficient to support the trial court's findings that Holley was unfit and had abandoned his children. Moreover, the evidence was not sufficient to support a finding that giving custody of B.H. and S.H. to Holley would not be in their best interests. Accordingly, the judgment of the trial court is reversed, and this cause remanded with instructions to terminate the guardianship.

Reversed and remanded.

BAILEY, J., concurs.

SHARPNACK, C.J., dissents with opinion.

SHARPNACK, C.J. dissenting.

I respectfully dissent and would affirm. As indicated by the majority, there is a strong presumption that it is in the best interests of the child to be placed in the custody of the natural parent, but this presumption can be overcome by a showing that (1) the parent is unfit; (2) long acquiescence in the child living with others; or (3) voluntary relinquishment of custody of the child to others such that the affections of the child and the third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. *McGuire*, 487 N.E.2d at 460. However, as acknowledged by the majority, our review of the record is not limited only to determining the existence of one of these three conditions; instead we will presume that the trial court correctly applied the law and will consider "whether there is any evidence in favor of the trial court's deter-

---

1. We would caution the trial judge in the future to be more circumspect in her comments during proceedings before her. We are left with the distinct impression that the trial judge would rather have been doing something other than giving these parties the patient hearing and considered result to which they were entitled, and we cannot condone conduct which leaves us, as it must surely have left the litigants, with the impression that their case was not important enough to merit the time required to have a full hearing.

mination that the presumption the interest of the child would be best served by placing him in the custody of the natural [parent] had been sufficiently rebutted by the evidence." *L.K.T.*, 665 N.E.2d at 912 (quoting *Turpen v. Turpen*, 537 N.E.2d 537, 539 (Ind.Ct.App.1989)).

In its findings of fact, the trial court found the following facts, in pertinent part:

"4. During [the parents'] stay at Fort Polk, ... [B.H. and S.H.'s] mother was a housewife and never left the Children alone with their father due to concerns regarding Mr. Holley's use of alcohol and propensity for violent out bursts. She hired a babysitter to be with the Children on those occasions when she needed to do errands or attend meetings away from home and Mr. Holley was at their residence.

\*\*\*\*\*

8. From the time of [parents'] legal separation in 1991 until ... [the] divorce on July 8, 1994, the Children had infrequent visitation and letter communication with their father.

9. ...When the Children's parents' divorce was finalized ... on November 27, 1996, [B.H. and S.H.] had not seen their father in one and one-half years, even though he was stationed in the United States during said period....

10. From the period beginning when the divorce was finalized on November 27, 1996 until their mother tragically died on December 21, 1998, [B.H. and S.H.'s] father exercised his visitation rights with them on only one occasion. On December 22, 1996, Mr. Holley took the Children to their paternal grandmother['s] ... home in Marion, Indiana. Mr. Holley, however, refused to tell their mother where he was taking them and, on the morning of December 24, 1996, mislead [sic] their mother to believe that [B.H. and S.H.] would be at the Chicago Airport at 7:00 that evening and that,

if she did not pick them up at said time and place, he was taking them to Minnesota. While en route to Chicago, [Mother] and [Childress] telephoned [paternal grandmother's] residence and were told that the Children were at her home....

11. [B.H. and S.H.'s] father came to their home in Greencastle again on December 28, 1996 to pick up the Children for an unscheduled visit and again would not disclose to their mother or their maternal aunt, Julie Carr, where he was taking the Children. When [B.H. and S.H.'s] mother and their aunt persisted to know where the Children were to be taken, [B.H. and S.H.] witnessed their father violently attack and physically batter Mrs. Carr. The Greencastle City Police were called to the scene and, when [B.H. and S.H.] spoke with the policemen and declined to leave with their father, Mr. Holley agreed to leave without the Children. Such incident precipitated a Petition for Protective Order being filed by [B.H. and S.H.'s] mother and Mrs. Carr against Mr. Holley. An Emergency Protective Order was issued against Mr. Holley ....

12.... Mr. Holley did not visit with the Children ... [again] until ... the weekend commencing January 15, 1999.

\*\*\*\*\*

15. From December, 1991 to date, the Children have received infrequent written and telephone communications from their father and have received infrequent birthday and Christmas gifts. Although Mr. Holley sent [B.H.] a computer in June, 1998, electronic mail between the Children and their father has also been infrequent. Since ... January 14, 1999 ... [B.H. and S.H.] have received only one telephone call from Mr. Holley. The Children are estranged from their ab-

sentee father and Mr. Holley has lacked any significant interaction with them since December, 1991.

16. [Childress] is the only psychological father that [B.H. and S.H.] have known since December, 1991. The Children have continuously resided with [Childress] since September, 1994.... The Children readily express their love for [Childress] and trust him without reservation. They refer to [Childress] as 'Dad'.

\*\*\*\*\*

21. [B.H.], in particular, expresses that he is leery of why his father wants he and [S.H] at this time and both Children strongly desire to continue to live with [Childress]. They are willing to visit their father occasionally and agree that they would like to know him as a 'friend' but not as 'Dad'.

22. The CASA Report filed by Cathy Taylor concludes that it is in the best interest of the Children to remain in Greencastle with [Childress]. [The children's psychotherapist] concurs with said conclusion and his clinical findings confirm that any abrupt change for the Children would cause them undue anxiety and be emotionally harmful to them given their mother's recent death and their strong bond with [Childress]. Mrs. Taylor notes in her Report that, when she confronted Mr. Holley about the Children's desire to remain with [Childress], he responded 'Too bad, they're my Kids'.

\*\*\*\*\*

24.... Mr. Holley was in arrears concerning his child support obligation in the amount of $3,446.00 as of February 14, 1997....

25.... On February 19, 1999, Mr. Holley's child support arrearages total $2,148.18 ....

\*\*\*\*\*

28. Mr. Holley acknowledges that he has no parenting skills. He admits his verbal and physical abusiveness and that he has never been counseled regarding anger control or received any psychiatric counseling. He admits his history of excessive drinking.... [H]e was arrested for Driving While Intoxicated in 1998 ... and he received a citation for Public Intoxication at a bar .... The Psychological Report on Mr. Holley also states in relevant part:

'... he is likely to come across as rather demanding and intolerant. There is a sense of entitlement about him... He is not very flexible in his approach to problems ... It is likely that he will engage in conflicts with others from time to time as he can be overly self-focused and have difficulty understanding the viewpoints of others and may lack empathy for them." '

Record, pp. 97–105.

The evidence substantially supports these findings. From these findings of fact, the court made the following conclusions, in pertinent part:

"2. The overwhelming factual evidence in the Cause confirms and supports this Court's ruling that: (a) Mr. Holley should not have custody of [B.H. and S.H.]; (b) Mr. Holley's lack of significant communication and the long periods of time when he did not visit with the Children, together with his lack of financial support of them, is tantamount to Mr. Holley having abandoned them; (c) the Children's happiness, stability and emotional well being will be jeopardized if he is awarded custody of them; (d) the Children have a strong bond with [Childress]; (e) it is in [B.H. and S.H.'s] best interest to remain in the custody of [Childress]; and (f) [Childress] is here-

by appointed as the Children's Guardian, until further order of the court.

3. It is clear to this Court that Mr. Holley's history of alcohol and abusiveness and his lack of taking an active role in the Children's lives presents a severe stumbling block for the Children to have a close relationship with him at this time.

*****

16. In the instant Case [Childress] has met his burden and shown in his petition for permanent Guardianship and by clear and cogent evidence ... that Mr. Holley is both unfit and had abandoned them. [Childress] has overcome the presumption in favor of the surviving parent and proven that it is not in the best interest of [B.H. or S.H.] to be placed in the custody of their father."

Record, pp. 105–109.

In reversing the trial court, the majority holds that the evidence is insufficient to support the conclusion that Holley is unfit or abandoned his children. Accepting that Holley could not be characterized as unfit or has having abandoned his children, the present case presents circumstances which support a conclusion that custody by a nonparent is in the children's best interest, even though not falling within the three traditional exceptions listed in case law. *See, e.g., In re Huber,* 723 N.E.2d 973, 976 (Ind.Ct.App.2000) (stating that "[w]e agree with the trial court that there are perhaps circumstances outside of the three traditionally listed in case law which might support a conclusion that custody of the children by a nonparent is in their best interest"). Given the standard of review that is to be employed in cases such as these, I believe that the findings and conclusions of the trial court are sufficient to uphold the grant of custody to Childress.

In *Turpen,* the father had custody of the child. *Turpen,* 537 N.E.2d at 538. When the child was five, the father died and the paternal grandparents sought custody of the child. *Id.* The evidence offered to rebut the presumption in favor of the biological mother was as follows: (1) Mother had been a heavy drinker in the past and although she declared that she had only drank infrequently in the last four years, she never received counseling for the problems which precipitated her drinking; (2) Mother's brother had difficulty controlling his alcohol consumption and got into a fight with Mother's boyfriend in the child's presence; (3) Mother's boyfriend, who had been convicted of reckless driving after an alcohol-related offense, locked the child in a closet on one occasion; (4) Mother's psychological evaluation indicated that she tended to be compulsive, make impulsive judgments when under emotional stress, and to repress or suppress unpleasant events. *Id* . at 539–540. Much of the remaining evidence about Mother presented her in a positive light, showing her to be capable of being a custodial parent of the child. *Id.* at 540. Evidence presented indicating that it was in the child's best interest to remain with his grandparents included the child's strong desire to stay with his grandparents, the child's exclusion of the mother when asked to draw a picture of his family, and testimony from a psychologist that it would be in the child's best interest to remain with his grandparents because in doing so he would be able to maintain the relationships and daily routine established by his father and would be at a lesser risk of becoming an alcohol abuser than if placed with his mother. *Id.* In upholding the trial court's grant of custody to the grandparents, Judge Robertson wrote:

"We recognize that much of the evidence was favorable to [Mother] and that this case is a close one. While we might not have attached as much significance to the evidence recited above as the trial court apparently did, and while admittedly the evidence is not overwhelming, this evidence does support the trial

court's determination that the presumption in favor of the mother had been adequately rebutted."

*Id.*

The instant case is similar in that Holley has a history of alcohol abuse and anger control problems for which he has never received counseling. While Holley claims that he now drinks only minimally, he was arrested for driving while intoxicated as recently as 1998 and was thereafter arrested for public intoxication. This indicates that Holley still has unresolved issues with regard to his drinking. Moreover, Holley battered the children's aunt while in the presence of the children, wreaked havoc during his infrequent visits with the children, and was largely absent from the children's lives.[2] Considering this information, along with the fact that the children are emphatic about their desire to remain with Childress and that the CASA and the children's psychotherapist both indicated that remaining with Childress was in the children's best interest, there is sufficient evidence to support the trial court's determination that Childress had adequately rebutted the presumption in favor of Holley. See *id.; c.f. Huber,* 723 N.E.2d at 976 (a generalized finding that placement of the child with a nonparent is in the best interests of the child is insufficient to support such a decision). Also, the trial judge interviewed B.H. and S.H., who are fourteen and thirteen respectively, in camera in order to better ascertain their wishes and best interests. See, e.g., Ind. Code § 31–17–2–9 (allowing the court to interview a child in chambers to ascertain his or her wishes); Ind. Code § 31–17–2–8 (noting that the court must consider all relevant factors in making custody determinations, including the wishes of the child, with the wishes of the child given more consideration if the child is at least fourteen years old); *Blue v. Brooks,* 261 Ind. 338, 342–343, 303 N.E.2d 269, 272 (1973) (quoting *Bailey,* 412 P.2d 480, 484 (Ariz.Ct.App. 1966) (noting that confidential interviews between the court and the children involved should be encouraged and that the "information given to the trial judge during the in chambers conference may well be the crucial and determining factor in the court's decision")). Although the contents of the interview was not included as part of the record and therefore not before this court for review, we must assume that the trial court's decision, which I believe there is substantial evidence on the record to sustain, is fortified and strengthened by the in chambers conference. *See Blue,* 261 Ind. at 343, 303 N.E.2d at 272 (quoting *Bailey,* 412 P.2d at 484). We may not reweigh the evidence nor substitute our judgment for that of the trial court. I respectfully dissent and would affirm.

---

2. The majority indicates that the evidence that Holley was physically abusive to the children's mother, verbally abusive to B.H., and abused alcohol is not relevant because these incidents occurred at least ten years prior to these proceedings and there is no evidence that anger control or alcohol abuse remain to be problems for Holley. However, Holley has had two alcohol related arrests in the fairly recent past and admittedly battered the children's aunt, in the presence of the children, only three years prior to the custody order from which he is appealing. Therefore, there is evidence that Holley continues to have problems with alcohol abuse and anger control, making the aforementioned evidence relevant in this custody determination.